**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-2174
_____

SHAWN C. SHARP,
Appellant
v.

SUPERINTENDENT JOHNSON; DEPUTY
SUPERINTENDENT KRYSEVIG;
DEPUTY SUPERINTENDENT DICKSON; DEPUTY
SUPERINTENDENT STICKMAN, PROGRAM
MANAGER RHODA A. WINSTEAD;  CHAPLAIN
FATHER TURSA, CHAPLAIN TANKO IBRAHIYM,
SUPERINTENDENT CONNER BLAIN;  DEPUTY
SUPERINTENDENT PAUL STOWITZKY;  DEPUTY
SUPERINTENDENT JOHN MILLER, CAPTAIN
COLEMAN; LIEUTENANT FISHER;  MAJOR
MELVIN  LOCKETT; LIEUTENANT MATCUS;
LIEUTENANT BLAKEY; JEAN A. MEARS;
CHAPLAIN GEORGE J. MONECK; CHAPLAIN
IHMAM MUHAMMED,
_____

1

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 2-00-cv-02156
Magistrate Judge: The Honorable Amy Reynolds Hay

Argued November 8, 2011

Before: SCIRICA, SMITH, and JORDAN, *Circuit Judges*

(Filed: February 9, 2012)

Anderson T. Bailey (Argued)
Thomas S. Jones
Jones Day
500 Grant Street
Suite 4500
Pittsburgh, PA 15219
    *Counsel for Appellant*

Kemal A. Mericli (Argued)
Scott A. Bradley
Office of Attorney General of Pennsylvania
564 Forbes Avenue
Manor Complex
Pittsburgh, PA 15219

Susan J. Forney

Office of Attorney General of Pennsylvania
15th Floor
Strawberry Square
Harrisburg, PA  17120
    *Counsel for Appellee*

———————————————

OPINION

———————————————

SMITH, *Circuit Judge.*

Plaintiff Shawn Sharp, an inmate in the custody of the Pennsylvania Department of Corrections ("DOC"), brought this civil rights action in November 2000 claiming that two prison facilities (SCI-Pittsburgh and SCI-Greene) unlawfully denied his request to accommodate his particular religious group.[1]  After years of motions practice, in which

———————————————

[1] Eleven defendants testified at the bench trial in this matter. They were Philip Johnson, William Stickman, Joel Dickson, Mark Krysevig, Rhoda Winstead, Father William Terza and Imam Tanko Ibrahiym, who were assigned to SCI-Pittsburgh during all times relevant to the respective allegations made by Sharp, and William Stickman, Brian Coleman, Jean Mears, Father George Moneck and Imam Abu Bakr Muhammad, who were assigned to SCI-Greene.  All of these individuals are Appellees in this matter.  The remaining seven defendants did not testify at trial and include Conner Blain, Lieutenant Blakey, Lieutenant Fisher, Melvin Lockett, Lieutenant Matcus, John Miller and Paul Stowitzky.

several of Sharp's claims were dismissed, Sharp's remaining two claims proceeded to a three-day bench trial before the Magistrate Judge.[2]  They were: (1) a claim pursuant to 42 U.S.C. § 1983 that Defendants' policies and practices violated Sharp's right to practice his religion as guaranteed by the First and Fourteenth Amendments (the "First Amendment Action"); and (2) a claim pursuant to the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc (2000) (the "RLUIPA Action").  The Magistrate Judge entered judgment in favor of Defendants and issued a memorandum setting forth her findings of fact and conclusions of law.  We will affirm.

## I. BACKGROUND

Sharp is serving a life term of imprisonment following his conviction for first degree murder.  He was incarcerated at SCI-Pittsburgh from September 18, 1998 to May 23, 2001.  Sharp was transferred to SCI-Greene and was incarcerated there from May 23, 2001 to June 13, 2006, when he was transferred to SCI-Dallas.

---

[2] The parties consented to have the Magistrate Judge conduct all proceedings in this case, including entry of final judgment, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

## A. SCI-PITTSBURGH

1. RELIGIOUS SERVICES OFFERED AND
   POLICIES FOR REQUESTING RELIGIOUS
   ACCOMMODATIONS

SCI-Pittsburgh recognizes and accommodates several different religions and religious groups, namely Christians, Jews, and Muslims. With respect to Christianity, SCI-Pittsburgh offers Catholic, Protestant, and Jehovah's Witnesses services. As to Islam, SCI-Pittsburgh offers Nation of Islam, Moorish Science Temple, and Sunni Muslim services.

An inmate practicing a religion not covered by the aforementioned groups may request an accommodation. DC-Administrative 819 ("DC-ADM 819") sets forth the DOC's policy for requesting recognition of a religion and obtaining services for that group. The version of DC-ADM 819 that was in effect from March 2, 1998 until July 15, 2002 stated, in pertinent part, that:

> Requests to engage in religious practices . . . which are not being accommodated by the [DOC], must be initiated by the inmate via an 'Inmate Religious Accommodation Request Form' . . . . The form shall be completed by the requesting inmate and submitted to the Facility Chaplaincy Program Director for review by appropriate staff.

The Inmate Religious Accommodation Request Form, also known as DC-52, stated that "[i]f more than one inmate is filing a request, each inmate must submit a form. If this is a group request, information must be submitted to the Facility Chaplaincy Program Director, who will compile information about the group request." After the inmate submits this form, the prison's chaplain director must obtain publications from the faith group regarding the goals, beliefs and practices of that group. The chaplain then circulates a recommendation form to certain prison officials, each of whom makes a written recommendation as to whether the request should be granted or denied. The chaplain then forwards the prisoner's request, the compiled religious information, and the staff recommendations to the Administrator of Religion and Family Services at the DOC central office, who ultimately determines whether to approve or deny the request.

2.  SHARP'S INCARCERATION AND ACCOMMODATION REQUEST AT SCI-PITTSBURGH

Sharp is a member of the faith group known as Ahlus Sunnati Wal Jama'ah, whose members are frequently referred to as Sunni Muslims. There are different subsets within the

6

broader Sunni Muslim group. Sharp identifies himself as a member of the Habashi sect.[3]

The Islamic Chaplains testified that Muslims at the prison typically take part in Jumah and Taleem. Jumah is a group prayer service held on Fridays that every Muslim is obligated to attend if possible. Taleem is a religious study period that is generally held on a weekly basis though there is no religious obligation to attend. Defendant Tanko Ibrahiym, the Islamic Chaplain at SCI-Pittsburgh from 1998 to 2004 and a self-identified Sunni Muslim, led Jumah services and

---

[3] Testimony from Imam Muhammad and exhibits introduced at trial provided general background information regarding the Habashi sect. Pursuant to this information, the Habashis are followers of Abdullah Alharrari Alhabashi, an Ethiopian who settled and taught in Lebanon. The Habashi are offspring of the Al-Ashari community, which was founded by Abu-Hasan Al-Ashari around the year 860 A.D.

One of the purported differences between the Habashi sect of Sunni Islam and other Sunni sects is the direction of prayer. As a precondition for a Muslim's prayers to be valid, those prayers must be offered toward the Qiblah, which is the direction to the Kabah, the holy shrine in Mecca. Thus, the direction of a Muslim's prayer is dependent on the orientation between that person's current location and the Kabah. Imam Muhammad estimated that 99.9% of Muslims in the United States pray in a northeast direction. Habashis, however, contend that the Kabah is southeast from the United States, and they pray in that direction.

Taleem classes for Sunni Muslims at the prison.  Sharp regularly attended these services and classes.

At some point, Sharp informed Imam Ibrahiym that he believed there were ideological differences between Sharp's Habashi sect and the recognized Sunni group at SCI-Pittsburgh.  Sharp believed that the Habashi could not be accommodated within the Sunni Muslim community at SCI-Pittsburgh.  Imam Ibrahiym disagreed with Sharp's assertion that the Habashi were not being accommodated and advised that if Sharp was a Sunni Muslim, as he claimed to be, then there was no reason why Sharp could not attend the services and programs that were offered to the Sunni Muslims at SCI-Pittsburgh.

On October 14, 1999, Sharp, on behalf of a purported group of Habashi members, submitted a typed document titled "Religious Accommodation Request for Ahlus Sunnati wal Jama'ah," requesting recognition and accommodation of the Habashi sect.  In particular, Sharp sought space for separate Jumah services and Taleem classes on behalf of his purported group of 30 inmates.  Although the document submitted was not the DC-52 form required by DC-ADM 819, it contained similar substantive information.

Imam Ibrahiym discussed this group request with Defendant Father William Terza, who was the Facility Chaplain Program Director and was responsible for overseeing the chaplaincy program at SCI-Pittsburgh.  Father Terza informed Sharp that his request was improperly submitted because it did not include an individual request on the proper DC-52 form, as required by DC-ADM 819.  Father

Terza told Sharp that once he submitted the proper form, Father Terza would circulate it to the appropriate SCI-Pittsburgh staff members for their recommendation and then forward it to the DOC central office for a decision. The District Court found that Sharp never submitted the proper individual request form to Father Terza.

On November 28, 1999, a meeting was held between Defendant Mark Krysevig, who was the Deputy Superintendent at SCI-Pittsburgh, Defendant Rhoda Winstead, who was the Corrections Classification Program Manager (the "CCPM") at SCI-Pittsburgh, Imam Ibrahiym, Father Terza and several inmates, including Sharp, to discuss SCI-Pittsburgh's Ramadan services. Specifically, discussions were held to determine how Ramadan, a month-long Muslim observance, would be accommodated among the various Muslim groups and inmates who wished to participate. At this meeting, Sharp again — this time orally — raised his request for a group accommodation of his Habashi sect.

On November 30, 1999, Sharp was placed in administrative custody (i.e., the restrictive housing unit) because, according to Defendants, Sharp's efforts to organize a separate religious group were creating a threat to institutional security. In particular, the prison officials found that Sharp was a danger to others, that he was attempting to establish himself as the leader of a group of inmates, and that he threatened disruption and violence if his religious group was not recognized. Defendants Krysevig and William Stickman, who was the Deputy Superintendent for Facility Management at SCI-Pittsburgh, believed that Sharp was more interested in placing himself in a leadership position over a

group of inmates than obtaining a genuine religious accommodation. Several inmates complained to Krysevig that Sharp was being disrespectful of their beliefs, and Krysevig was concerned that these other inmates might retaliate against Sharp. In sum, Sharp was placed in administrative custody for "fomenting unrest in group activity."

On December 1, 1999, Sharp filed Grievance No. PIT-0997-99 (the "Pittsburgh Grievance") questioning why no determination had been issued with respect to his group request for accommodation. On December 20, 1999, Winstead denied the Pittsburgh Grievance in writing, stating, in pertinent part:

> At the meeting you mention on November 28, 1999 it was verified that all staff mentioned received a copy of your proposal [i.e., Sharp's request for an accommodation].

> In accordance with DC-ADM 819-3 for religious accommodations, you were to submit the proper form requesting such an accommodation for you as an individual. Any other inmates requesting an accommodation must be filed individually. Your form should be forwarded to the chaplaincy coordinator. Your form was improperly filed.

The SCI-Pittsburgh Defendants testified that Sharp never submitted a form requesting religious accommodations for himself as an individual. Sharp claims that he and other

Habashi members submitted handwritten, individual requests for accommodation to Imam Ibrahiym. Imam Ibrahiym's trial testimony on this issue was, at best, unclear. Imam Ibrahiym testified that he never received a DC-52 form from Sharp or any other of the inmates that practice Habashi. Later, Imam Ibrahiym testified that he received written requests for accommodation from Sharp, though the nature of these purported requests was unclear.[4]

Sharp appealed the denial of the Pittsburgh Grievance to Defendant Philip Johnson, who was Superintendent of SCI-Pittsburgh. On January 5, 2000, Johnson dismissed Sharp's appeal as untimely.

Sharp further claims that, while he was in administrative custody, Defendants proposed that he sign a behavioral modification contract that included a condition that he agree not to practice his religion in exchange for release into the general population. SCI-Pittsburgh had a Program Review Committee ("PRC") that would periodically meet with inmates confined to administrative custody and review their restricted status. Defendants Krysevig and Joel Dickson, who was the Deputy Superintendent at SCI-

---

[4] The Magistrate Judge did not find Sharp's claim that he submitted a handwritten, individual request to Imam Ibrahiym credible because Sharp could not produce a copy of this request at trial despite producing copies of all the other important documents in the case. The Magistrate Judge also found Sharp's claim belied by his grievance requests, which refer to group requests, not an individual request.

Pittsburgh, were on Sharp's PRC.[5] Because the PRC had "serious reservations" about releasing Sharp into the general population absent modification of his behavior, the PRC offered him the opportunity to agree to a behavioral modification contract. Behavioral modification contracts were informal agreements between the institution and the inmate setting the terms of the inmate's release from administrative custody. If the inmate fails to comply with the terms of the contract, he can be returned to administrative custody. The PRC proposed a behavioral modification contract to Sharp, the general terms of which were to include promises by Sharp to cease fomenting unrest and to refrain from showing disrespect for the religious beliefs and practices of others, in exchange for release from administrative custody. Sharp was to draft the specific language of the contract. Both Krysevig and Dickson testified that the PRC never made restrictions on Sharp's practice of his religion a condition of his release from administrative custody. Sharp never submitted a draft to — nor reached an agreement with — the PRC.[6]

On May 23, 2001, the DOC transferred Sharp from SCI-Pittsburgh to SCI-Greene.

---

[5] Defendant Melvin Lockett, who was a Unit Manager at SCI-Pittsburgh, was the third member of Sharp's PRC.

[6] Collectively, Defendants Johnson, Krysevig, Dickson, Stickman, Winstead, Terza, and Ibrahiym are the "SCI-Pittsburgh Defendants."

12

## B. SCI-GREENE

1. RELIGIOUS SERVICES OFFERED AND
   POLICIES FOR REQUESTING RELIGIOUS
   ACCOMMODATIONS

SCI-Greene recognizes and accommodates several different religions and religious groups, namely Christians, Jews, Native Americans and Muslims. With respect to Christianity, SCI-Greene offers Catholic, Protestant, Jehovah's Witness and Yoke Fellowship services. As to Islam, SCI-Greene offers Nation of Islam and Sunni services. Effective July 15, 2002, the DOC issued a revised DC-ADM 819. This revised policy stated, in pertinent part, that requests for religious accommodation were to be made as follows:

> a. Each inmate must use a **DC-52, Inmate Religious Accommodation Request Form** . . . to submit his/her request for accommodation to the FCPD [Facility Chaplaincy Program Director].
>
> * * *
>
> c. The inmate shall obtain written information from his/her outside faith group, including any publications that describe the goals, beliefs, and practices of the group and supply this information to the FCPD for review.
>
> d. The Religious Accommodation Review Committee shall review each inmate's request for a religious accommodation within 45 days

13

of receipt and forward a recommendation to the affected Regional Deputy Secretary.

e. The Regional Deputy Secretary shall, within 15 days of receiving the recommendation from the Director of the Bureau of Inmate Services/designee, approve/disapprove the request and notify the Director of the Bureau of Inmate Services of the decision.

f. The Director, Bureau of Inmate Services shall, within 10 days, inform the Facility Manager and the FCPD of the requesting facility of the determination and ensure copies of all final determinations are provided to all Deputy Secretaries and Facility managers. The FCPD shall be responsible for informing the affected inmate of the outcome of his/her request no later than 10 working days from the date that the determination of approval/disapproval is received.

g.  If an inmate is informed by the FCPD that the request will not be accommodated, the inmate may then file a grievance in accordance with Department policy **DC-804, "Inmate Grievances."** Grievances may only be submitted after the inmate has received notification of the decision on the requested accommodation.

(emphasis in original). The DOC did not make any substantive changes to the DC-52 Inmate Religious Accommodation Request Form.

Defendant Imam Abu Bakr Muhammad, who was the Muslim Chaplain at SCI-Greene, testified that he is a Sunni Muslim. Imam Muhammad provided Taleem and led the weekly Jumah prayer services for Muslim inmates.

2.    SHARP'S INCARCERATION AND
      ACCOMMODATION REQUESTS AT SCI-GREENE

On September 30, 2002, more than a year after being transferred to SCI-Greene, Sharp submitted a DC-52 form requesting an individual religious accommodation of his Habashi sect pursuant to DC-ADM 819.[7] Sharp's request sought, among other things, Jumah services and Taleem study, library space with books teaching his beliefs, prayer time at sunset during Ramadan with others who shared his beliefs, an outside coordinator on a weekly basis, and a community bank account.

Defendant Father George Moneck, who was the Director of Chaplaincy at SCI-Greene, reviewed Sharp's request and recommended that the DOC central office deny it. Father Moneck further commented on the form that Sharp "can practice his religion privately. [SCI-Greene] cannot

---

[7] Sharp identified the formal name of his religion as "Islam as taught by the Ashariy Community of Ahlus Sunnah wal Jama'ah," but he noted that it is commonly referred to as Habashi.

accommodate another Muslim sect. [Sharp] is most welcome to join the Sunni or the Nation of Islam communities."

Father Moneck circulated the vote form to the other staff members, who all recommended that Sharp's request be denied. Defendant Jean Mears, who was SCI-Greene's CCPM, generally reviewed inmates' requests for religious accommodation. Mears, however, was unavailable when Sharp's request was circulated. Michael Bruno, who was SCI-Greene's acting CCPM at the time, reviewed and recommended that the DOC central office deny Sharp's request. Bruno is not a defendant in this action. Stickman, who was promoted to Superintendent at SCI-Greene in 2002,[8] generally participated in reviewing inmates' requests for religious accommodation. Stickman, however, was unavailable and did not participate in the review of Sharp's request. Defendant Paul Stowitzky, who was SCI-Greene's acting superintendent at the time, reviewed and recommended that the DOC central office deny Sharp's request.[9]

---

[8] This is the same Defendant who was the Deputy Superintendent at SCI-Pittsburgh during Sharp's incarceration at that prison.

[9] Two others voted to recommend that Sharp's request be denied: the Major-of-the-Guard and the Deputy Superintendent for Centralized Services. The record is not clear who these individuals are, and they do not appear to be named as defendants.

16

Father Moneck submitted Sharp's request and the staff's recommendations to the DOC's central office for a final determination. On December 18, 2002, the central office denied Sharp's request. Father Moneck informed Sharp that his request was denied because he was "able to attend existing Islamic services or practice [his] religion privately in [his] cell."

On December 26, 2002, Sharp submitted Grievance No. 39662 (the "Greene Grievance"), challenging the denial of his request for an accommodation. Mears conducted the initial review and denied Sharp's grievance because, in her estimation, Sharp was not denied the right to practice his faith or prohibited from maintaining his beliefs and praying in his cell. Sharp appealed the denial of his grievance to Stickman. This appeal was dismissed as untimely. Sharp did not submit any other requests for religious accommodation at SCI-Greene.

Sharp complained to Defendant Brian Coleman, who was the Security Captain at SCI-Greene, about the content of certain sermons given by Imam Muhammad. Sharp specifically complained that Imam Muhammad made derisive comments about the Habashi sect and Sharp in particular. Coleman informed Mears of Sharp's complaint. Mears and Father Moneck reviewed the videotape of Imam Muhammad's sermons and found nothing inflammatory.

Sharp claimed that Coleman ordered his cell to be searched in order to confiscate Sharp's religious materials. Coleman denied this and testified that he had never ordered a

search of an inmate's cell specifically to retrieve religious materials.

Sharp also claimed that Imam Muhammad would not allow him to participate in Ramadan services unless Sharp signed an agreement that he would not practice his Habashi faith. Imam Muhammad denied this and testified that, although he did develop an agreement form for inmates wishing to participate in Ramadan, this form did not require the inmates to profess or practice a specified religion.[10]

On June 13, 2006, the DOC transferred Sharp from SCI-Greene to SCI-Dallas.

---

[10] Collectively, Defendants Coleman, Mears, Moneck, Muhammad, Stowitzky, and Stickman are the "SCI-Greene Defendants." Collectively, the SCI-Pittsburgh and Greene Defendants are the "Defendants."

The Magistrate Judge dismissed, among others, the following defendants prior to trial: Blaine, Miller, Fisher, Lockett, Matcus, and Blakey. On appeal, Sharp has not expressly challenged the dismissal of these parties. In fact, Sharp's supplemental brief only references these individuals in the case caption. Consequently, Sharp has abandoned any issues with respect to these individuals on appeal. *See, e.g., Kost v. Kozakiewicz*, 1 F.3d 176, 182-83 (3d Cir. 1993); *Nagle v. Alspach*, 8 F.3d 141, 143 (3d Cir. 1993).

C.  PROCEDURAL BACKGROUND

On November 2, 2000, Sharp filed his complaint.[11] The case underwent years of motions practice and several of Sharp's claims were dismissed prior to trial.[12]  Sharp's First Amendment and RLUIPA Actions proceeded to a bench trial before the Magistrate Judge.

On April 7, 2008, the Magistrate Judge entered judgment in favor of Defendants and set forth her findings of fact and conclusions of law in a comprehensive memorandum.  The Magistrate Judge found against Sharp on the First Amendment Action because, among other things: Sharp failed to comply with the DOC's regulations regarding

---

[11] Counsel was appointed and represented Sharp for much of the pre-trial proceedings, but Sharp's counsel, apparently at Sharp's request, sought to withdraw prior to trial.  Thereafter, Sharp proceeded *pro se*, including at trial.

[12] By Order dated December 28, 2004, the Magistrate Judge granted Defendants' motion to dismiss and/or for summary judgment with respect to Sharp's claims for: compensatory damages under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb; lost and/or destroyed property; and lost wages and employment opportunities.
By Order dated December 28, 2005, the Magistrate Judge granted Defendants' motion for summary judgment, dismissing Sharp's claims asserting violations of his rights under the Eighth Amendment and Fourteenth Amendment's Due Process Clause.

individualized submissions (SCI-Pittsburgh); Sharp failed to meet his burden of demonstrating that denial of his request had no rational connection to any legitimate penological interest (SCI-Greene); the Defendants did not have any personal involvement in the denial of Sharp's requests to support a § 1983 action (SCI-Pittsburgh and Greene); and Defendants were entitled to qualified immunity (SCI-Pittsburgh and Greene). The Magistrate Judge found against Sharp on the RLUIPA Action because, among other things: Sharp was not entitled to any relief under the statute; Defendants were entitled to qualified immunity; and in any event, Sharp's claim failed on the merits.

Sharp appealed.[13]

## II. DISCUSSION

The District Court had jurisdiction under 28 U.S.C. § 1331. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

We apply a clearly erroneous standard when reviewing the findings of fact from a bench trial and a plenary standard to the conclusions of law. *Trustees of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 191 (3d Cir. 2003).

---

[13] On April 21, 2008, Sharp filed a *pro se* notice of appeal. After the initial briefs were submitted, we requested supplemental briefing and appointed counsel to represent Sharp.

Defendants' motion to strike Section VI of Sharp's supplemental reply brief ("Section VI") is currently pending before us. Defendants assert that Section VI contains arguments regarding issues not raised in Sharp's supplemental brief. Sharp argues that these issues were raised in his informal brief, and that two of the three issues raised are a response to Defendant's supplemental opposition brief. We conclude that Section VI improperly exceeded the scope of Defendants' supplemental opposition brief. Accordingly, we grant Defendants' motion to strike Section VI in that we have given that portion of the brief no consideration in our decision.

## A. THE RLUIPA ACTION

Sharp's RLUIPA Action sought injunctive relief and money damages against Defendants in both their official and individual capacities. The Magistrate Judge held that Sharp's claims for injunctive relief were mooted by his transfer from SCI-Pittsburgh and SCI-Greene to SCI-Dallas, and that RLUIPA does not permit recovery against Defendants in their official or individual capacities. On appeal, Sharp is challenging only the Magistrate Judge's denial of his RLUIPA claim against Defendants in their individual capacities. The issue of whether RLUIPA permits actions against State officials in their individual capacities is one of first impression for this Court. For the reasons discussed below, we conclude that RLUIPA does not permit such actions.

RLUIPA permits plaintiffs to "obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2. "[G]overnment," in pertinent part, is defined as:

    (i)     a State, county, municipality, or other governmental entity created under the authority of a State;

    (ii)    any branch, department, agency, instrumentality, *or official of an entity listed in clause (i)*; and

    (iii)   *any other person acting under color of State law*[.]

22

42 U.S.C. § 2000cc-5(4)(A) (emphasis added).

Sharp argues that the express language of RLUIPA, in particular the separate references to an "official" and "any other person acting under color of State law," supports his position that Congress intended the statute to permit relief against government employees in their individual capacities. In particular, Sharp asserts that, by the "any other person acting under color of State law" language, Congress purposefully tracked its § 1983 language. Sharp concludes that because § 1983 permits recovery against a government employee in her individual capacity, so too must RLUIPA. Sharp, however, overlooks the constitutional underpinnings of RLUIPA. In fact, the Courts of Appeals for the Fourth, Fifth, Seventh and Eleventh Circuits — the only circuits we are aware of that have addressed this issue in precedential opinions — have rejected arguments similar to Sharp's and held that RLUIPA does not permit actions against government employees in their individual capacities. *See, e.g., Nelson v. Miller*, 570 F.3d 868, 886-89 (7th Cir. 2009); *Rendelman v. Rouse*, 569 F.3d 182, 186-89 (4th Cir. 2009); *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 327-29 (5th Cir. 2009); *Smith v. Allen*, 502 F.3d 1255, 1271-75 (11th Cir. 2007), *abrogated on other grounds, Sossamon v. Texas*, 131 S. Ct. 1651, 1654 (2011) (abrogating *Smith* as to the claim against government employees in their official capacities).

Congress enacted RLUIPA pursuant to its spending power under Article I of the Constitution.[14] When Congress enacts legislation pursuant to its spending power, it may attach conditions on the receipt of federal funds and essentially create a contract between the federal government and the State recipient. *Smith*, 502 F.3d at 1273; *see also Nelson*, 570 F.3d at 887 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). As a result, the statute may, as a condition of the funding, "subject the grant *recipient* to liability in a private cause of action, but the spending power cannot be used to subject individual defendants, such as state employees, to individual liability in a private cause of action." *Smith*, 502 F.3d at 1274; *see also Sossamon*, 560 F.3d at 329.

Thus, non-recipients of the funds, including individuals who are state officials, generally cannot be subject to private liability for monetary damages. *See, e.g.*, *Nelson*, 570 F.3d at 888-89 (stating that permitting suits against government officials in their individual capacity would "raise serious questions regarding whether Congress had exceeded its authority under the Spending Clause"); *Rendelman*, 569 F.3d at 189 (concluding that the RLUIPA's definition of "government" did not clearly convey Congress's intent to impose a condition of individual liability pursuant to the

---

[14] Although Congress enacted RLUIPA pursuant to both its spending power and the Commerce Clause, *see, e.g.*, 42 U.S.C. § 2000cc-1(b), the parties have conceded that only Congress's authority under the spending power is implicated here.

Spending Clause); *Sossamon*, 560 F.3d at 329 ("Congressional enactments pursuant to the Spending Clause do not themselves impose *direct* liability on a non-party to the contract between the state and the federal government."); *Smith*, 502 F.3d at 1273-74 (drawing an analogy to the court's Title IX jurisprudence, which does not permit suits against individuals because Title IX was enacted pursuant to the Spending Clause).

Moreover, when Congress desires to impose a condition under the Spending Clause, it is Congress's burden to affirmatively impose the condition in clear and unmistakable statutory terms. *See, e.g.*, *Pennhurst State Sch. & Hosp.*, 451 U.S. at 17. In *Pennhurst State School & Hospital*, the Supreme Court stated that

> [t]he legitimacy of Congress's power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." . . . There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

*Id.* (internal citations omitted).

Here, the Magistrate Judge correctly concluded that RLUIPA does not permit an action against Defendants in their individual capacities. Pennsylvania, not Defendants,

25

was the direct recipient of any federal funds. Thus, RLUIPA cannot impose direct liability on Defendants, who were not parties to the contract created between Pennsylvania and the federal government.[15]

Further, RLUIPA does not unambiguously signal Congress's intent to impose a condition of individual liability. The Supreme Court's recent decision in *Sossamon v. Texas* — which reviewed the related issue of whether States, by accepting federal funds, waived sovereign immunity under RLUIPA — is particularly instructive. In *Sossamon*, the Court held that States did not consent to waive their sovereign immunity with respect to RLUIPA suits for damages against State employees in their official capacities. *See* 131 S. Ct. at 1655. The Court reasoned that RLUIPA's authorization of "'appropriate relief against a government,' § 2000cc-2(a), [was] not an unequivocal expression of state consent" to waive sovereign immunity to suits for money damages. *Id.* at 1658-59. Rather, the Court found RLUIPA's "appropriate

---

[15] Sharp's reliance on *Sabri v. United States*, 541 U.S. 600 (2004), for the proposition that Congress may regulate the actions of third parties under the Spending Clause, is misplaced. In *Sabri*, Congress enacted the statute at issue, 18 U.S.C. § 666(a)(2), pursuant to its powers under the Spending and the Necessary and Proper Clauses to protect its expenditures against local bribery and corruption. *Sabri*, 541 U.S. at 602, 605-07. Here, however, Congress did not enact RLUIPA to protect its own expenditures, but rather it enacted RLUIPA to protect the religious rights of institutionalized persons. Thus, *Sabri* is inapposite.

relief" language to be "open-ended and ambiguous about what types of relief it includes," thereby precluding any finding that the States consented to waive sovereign immunity. *Id.* at 1659. Similarly here, it cannot be said that RLUIPA's "appropriate relief" language unambiguously signaled Congress's intent to impose a condition of individual liability.

Accordingly, the Magistrate Judge did not err when she entered judgment against Sharp and for Defendants on the RLUIPA Action.

## B. The First Amendment Action

We will affirm the judgment for Defendants on the First Amendment Action because the Magistrate Judge did not err in concluding that Defendants were protected by qualified immunity (discussed in greater detail *infra* Section II.B.2). The Magistrate Judge, however, did err in placing the burden on Sharp to demonstrate that the denial of his request had no rational connection to any legitimate penological interest. Although this error ultimately does not affect our holding, we discuss it next to provide clarity and avoid future confusion.

1. The Magistrate Judge Erred in Placing the Burden of Proof Regarding the Penological Interest Factor on Sharp

Inmates do not completely forego their constitutional rights because of their incarcerated status, but those rights are necessarily limited. *Waterman v. Farmer*, 183 F.3d 208, 213 (3d Cir. 1999) (citing *Jones v. N.C. Prisoners' Labor Union*,

27

433 U.S. 119, 125 (1977)). An inmate retains his First Amendment rights that are "not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *see also Turner v. Safley*, 482 U.S. 78, 89 (1987).

In *Turner*, the Supreme Court recognized that subjecting the day-to-day judgments of prison officials to a strict scrutiny analysis would impede the officials' ability to anticipate and solve security and administrative problems. 482 U.S. at 89. Instead, the Court found that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* The Court listed four factors that are relevant in determining the reasonableness of a particular prison regulation: (1) there must be a "valid, rational connection" between the prison regulation and the legitimate, neutral governmental interest put forward to justify it (the "First *Turner* Factor"); (2) whether the inmate has alternative means of exercising the right at issue; (3) the burden that the accommodation would impose on prison resources; and (4) whether any ready alternatives to the regulation exist that would fully accommodate the inmate's rights at *de minimis* cost to valid penological objectives (*Turner* factors 2-4 are the "Other *Turner* Factors"). *Id.* at 89-91 (quoting *Block v. Rutherford*, 486 U.S. 576, 586 (1984)).[16] *Turner* does not

---

[16] Note that the prisons do not have to use the least restrictive means possible to further legitimate penological interests. *Turner*, 482 U.S. at 90.

28

expressly state which party, the inmate or the prison, bears the burden of proving these factors.

After *Turner*, we developed a two-step analysis for determining whether a prison's regulation is reasonably related to a penological interest. First, the prison has the burden of demonstrating the First *Turner* Factor. *See Waterman*, 183 F.3d at 218 n.9; *Wolf v. Ashcroft*, 297 F.3d 305, 308 & n.2 (3d Cir. 2002). This burden is slight, and in certain instances, the connection may be a matter of common sense. *Wolf*, 297 F.3d at 308. Second, if the prison meets its burden under the First *Turner* Factor, then we consider the Other *Turner* Factors. *See Waterman*, 183 F.3d at 218 n.9; *Wolf*, 297 F.3d at 308 & n.2; *see also Jones v. Brown*, 461 F.3d 353, 360 (3d Cir. 2006).

After our decisions in *Waterman* and *Wolf*, the Supreme Court, in *Overton v. Bazzetta*, stated that where an inmate challenges regulations, the burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." 539 U.S. 126, 132 (2003). Notably, *Overton* did not expressly state that the burden for the First *Turner* Factor is on the inmate.

In *Jones v. Brown*, we interpreted *Overton* as placing the "ultimate burden of persuasion with regard to the reasonableness of a regulation" on the inmate but continued to require that the prison "put forward the legitimate governmental interest alleged to justify the regulation and demonstrate that the policy drafters could rationally have seen a connection between the policy and [that interest]." *Jones*, 461 F.3d at 360-61 (citations and quotation marks omitted

29

(alteration in original)).  Other Third Circuit decisions have followed *Jones*.  *See, e.g., Fontroy v. Beard*, 559 F.3d 173, 177 (3d Cir. 2009) ("Although the Inmates bear the ultimate burden of showing that the DOC's new mail policy is unconstitutional, it is the DOC Officials' burden to demonstrate that a rational connection exists between the policy and a legitimate penological interest."); *Monroe v. Beard*, 536 F.3d 198, 207 (3d Cir. 2008) (stating that the party challenging the regulation bears the burden of showing that it is unreasonable, but that the prison must come forward with a legitimate interest justifying the regulation).

Here, the Magistrate Judge erred in concluding that *Overton* overruled, *sub silentio*, our *Jones* line of cases that placed the burden for the First *Turner* Factor on the prison. *See Sharp v. Johnson*, No. 00 civ. 2156, 2008 WL 941686, at *12 (W.D. Pa. Apr. 7, 2008) (placing the burden on Sharp to "negative every conceivable legitimate penological interest which might support [Defendants'] denial of the accommodation").  First, *Overton*'s burden language does not support the Magistrate Judge's conclusion that the burdens of production and persuasion for all *Turner* factors fall on those challenging the regulations.  *See, e.g., Overton*, 539 U.S. at 132.  In other words, *Overton* did not tie its burden language to the *Turner* factors; rather, it made a statement about the general burden of persuasion where a prisoner is challenging a regulation.

Second, *Jones* is binding Third Circuit precedent, and it interpreted *Overton*'s burden language to mean that the "ultimate burden of persuasion" — not the burden to prove the First *Turner* Factor — is on the inmate.  *Jones*, 461 F.3d

30

at 360-61. In fact, the Supreme Court's plurality opinion in *Beard v. Banks*, 548 U.S. 521 (2006) ("*Banks*") supports *Jones*'s interpretation of *Overton*. In *Banks*, an inmate challenged the prison's policy of restricting certain periodicals and photographs. *Banks*, citing *Overton*, stated that the prisoner "bears the burden of persuasion" when he is challenging a regulation, 548 U.S. at 529, and that "*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective."[17] 548 U.S. at 535.[18]

---

[17] This is consistent with *Turner*, where the Court stated that "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest *put forward to justify it*." *Turner*, 482 U.S. at 89 (quotation marks omitted) (emphasis added). Commonsense dictates that only the prison officials, not the inmates, would be *putting forth* a legitimate governmental interest to support the regulation.

[18] Defendants' assertion that *Banks* is inapposite because it was presented to the Supreme Court in a different procedural posture (i.e., a motion for summary judgment) than the instant matter is not persuasive. *Banks* stated that *Turner*, not Federal Rule of Civil Procedure 56, requires prison authorities to demonstrate the connection between a regulation and its penological interest. *See, e.g.*, 548 U.S. at 535. Thus, *Banks* is applicable to the instant matter.

Third, contrary to Defendants' assertion, we see no internal inconsistency in our jurisprudence on the placement of the burden for the First *Turner* Factor. In *Newman v. Beard*, a case cited by Defendants, we upheld the dismissal of the inmate's First Amendment claim on a 12(b)(6) motion because the inmate did not allege that the regulation at issue served no legitimate penological objectives or was not reasonably related to rehabilitation. 617 F.3d 775, 781 (3d Cir. 2010). *Newman* involved a pleading deficiency, not a determination as to the burden of proof at trial.

In *Williams v. Morton*, the other case cited by Defendants for the proposition that our jurisprudence is inconsistent, we granted summary judgment for the prison officials and stated that the inmates "have the burden of disproving the validity of the regulation." 343 F.3d 212, 218 (3d Cir. 2003). This is essentially the same burden statement set forth in *Overton*, which we interpreted in *Jones* to mean the general burden of persuasion. In fact, the prison administrators in *Williams* set forth a number of legitimate penological interests to support their regulation. *See, e.g.*, 343 F.3d at 218 (listing simplified food service, prison security, and budgetary constraints as legitimate penological interests supporting the prison's refusal to serve Halal meat). Neither *Newman* nor *Williams* stated that they were deviating from the established Third Circuit precedent set forth in *Jones* and its progeny. We are satisfied that our jurisprudence on this issue is consistent.

Finally, policy concerns favor placing the burden of the First *Turner* Factor on prison officials. According to the Magistrate Judge, for Sharp to meet his burden of proving the

32

First *Turner* Factor, he would have to accomplish the herculean task of negating "every conceivable legitimate penological interest which might support" the denial of his accommodation. Defendants argue that a prisoner seeking a religious accommodation would merely have to show no impact on security, orderly administration of the prison, or expenditures. Defendants, however, ignore the fact that within these three broad categories are numerous sub-categories of potential penological interests that an inmate would also have to negate (e.g., the interests within expenditures would include: additional guard salary/overtime, purchase of religious books, space concerns within the library and prayer areas, additional chaplain expenses, and potential speaker fees). Placing this burden on prisoners unnecessarily creates inefficiencies and would invite speculation into the often subjective motivations of prison officials. Consequently, policy implications favor placing the burden on the prison officials.

Accordingly, the Magistrate Judge erred in placing the burden for the First *Turner* Factor on Sharp. This error, however, was not fatal to the judgment on the First Amendment Action because Defendants were entitled to qualified immunity.

2.    QUALIFIED IMMUNITY

As an initial matter, the Magistrate Judge did not err in determining that Defendants did not waive their qualified immunity defense. We review a lower court's decision regarding the waiver of an affirmative defense for abuse of discretion. *See, e.g., Cetel v. Kirwan Fin. Group, Inc.*, 460

33

F.3d 494, 506 (3d Cir. 2006); *see also Eddy v. V.I. Water & Power Auth.*, 256 F.3d 204, 210 (3d Cir. 2001).[19]  Qualified immunity is an affirmative defense and generally must be included in a responsive pleading or may be considered waived.  *See, e.g.*, *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001) (stating that qualified immunity is an affirmative defense); *see also* Fed. R. Civ. P. 8(c).  Although it is true that parties should generally assert affirmative defenses early in the litigation, there is no firm rule.  *See Cetel*, 460 F.3d at 506.  Thus, affirmative defenses may be raised at any time, even after trial, so long as the plaintiff suffers no prejudice. *See Cetel*, 460 F.3d at 506 (citing *Charpentier v. Godsil*, 937 F.2d 859, 863-64 (3d Cir. 1991)).  A party may raise qualified immunity as a defense at trial, especially where the facts are not clear.   *See Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) (stating that fact issues may require a trial before determining whether qualified immunity is appropriate); *Eddy*, 256 F.3d at 210 n.3 (stating in dicta that qualified immunity may be raised at trial).

Here, Defendants, who pled qualified immunity as an affirmative defense, placed Sharp on notice of their intent to raise that defense at trial.  Defendants' delay in asserting qualified immunity was understandable because trial testimony was necessary to develop the contours of Sharp's

---

[19] A court abuses its discretion when its decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact."  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) (quoting *Hanover Potato Prods., Inc. v. Shalala,* 989 F.2d 123, 127 (3d Cir.1993)).

claims and to determine certain factual issues, including the number of Habashi adherents at SCI-Pittsburgh and Greene. Sharp, who was proceeding *pro se* at trial, did not incur any unnecessary legal fees as a result of Defendants' delay, and he has not identified any substantial prejudice caused by the delay. If anything, Sharp may have benefited from the delay because he was afforded the opportunity to introduce evidence at trial demonstrating that qualified immunity was improper under the circumstances. Consequently, the Magistrate Judge did not abuse her discretion by permitting Defendants to raise their qualified immunity defense at trial.

The Magistrate Judge also did not err in holding that Defendants were protected by qualified immunity because they did not violate Sharp's clearly established rights. We review the grant of qualified immunity *de novo* as it raises a purely legal issue. *See Burns v. PA Dep't of Corr.*, 642 F.3d 163 (3d Cir. 2011). The qualified immunity doctrine "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citations and quotation marks omitted); *see also Ray v. Twp. of Warren*, 626 F.3d 170, 173 (3d Cir. 2010). "Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Ray*, 626 F.3d at 173-74. Thus, so

35

long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability. *See Pearson*, 555 U.S. at 244.

In *Saucier v. Katz*, the Supreme Court established a two-part analysis for determining when qualified immunity is applicable: (1) whether the official's conduct violated a constitutional or federal right; and (2) whether the right at issue was "clearly established." 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236 (relaxing the *Saucier* analysis by no longer requiring courts to determine the *Saucier* prongs in sequential order); *see also Ray*, 626 F.3d at 174.

A right is clearly established for qualified immunity purposes where its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202; *see also Williams v. Bitner*, 455 F.3d 186, 191 (3d Cir. 2006). In determining whether a right has been clearly established, the court must define the right allegedly violated at the appropriate level of specificity. *Williams*, 455 F.3d at 191 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). In some cases, even though there may be no previous precedent directly on point, an action can still violate a clearly established right where a general constitutional rule already identified in the decisional law applies with obvious clarity. *Williams*, 455 F.3d at 191 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

At issue here is whether Sharp had a clearly established right under the First Amendment to separate

religious services in accordance with the Habashi sect of Sunni Islam when Sunni Islamic services were already available. The Supreme Court has stated that "[a] special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972). We echoed this when we said, "The requirement that a state interpose no unreasonable barriers to the free exercise of an inmate's religion cannot be equated with the suggestion that the state has an affirmative duty to provide, furnish, or supply every inmate with a clergyman or religious services of his choice." *Gittlemacker v. Prasse*, 428 F.2d 1, 4 (3d Cir. 1970). Although we later stated that "an opportunity to worship as a congregation by a substantial number of prisoners may be a basic religious experience and, therefore, a fundamental exercise of religion by a bona fide religious group," *Small v. Lehman*, 98 F.3d 762, 768 (3d Cir. 1996),[20] we have never indicated, let alone clearly established, that a single prisoner or a non-substantial number of like-minded prisoners are entitled to place on the state the burden of

---

[20] *Small* held that the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb, applies to prisoners' claims. 98 F.3d at 768. Subsequent to our decision in *Small*, the Supreme Court in *City of Boerne v. Flores* declared the RFRA unconstitutional. 521 U.S. 507 (1997). Although *Small* has been overruled in part by *Boerne*, *Small*'s finding that communal worship by a substantial number of prisoners may be a fundamental aspect of the exercise of religion is still good law in the Third Circuit.

furnishing separate religious services for them.[21]  Given this precedent, a reasonable official would not have understood the denial of Sharp's request, whether made by Sharp on behalf of either himself or a small number of inmates, to violate a constitutional right.[22]

---

[21] *Cf. Smith v. Kyler*, 295 F. App'x 479, 483-84 (3d Cir. 2008) (determining an inmate's Free Exercise rights were not violated by a DOC policy prohibiting group worship in the absence of an approved faith group leader); *Boretsky v. Corzine*, No. 08 civ. 2265, 2011 WL 2610370, at *13 (D.N.J. June 30, 2011) (holding that a Jewish inmate's restriction from congregational services as well as communal activities did not violate his constitutional rights); *Palmer v. Rustin*, No. 10 civ. 0042, 2011 WL 2489820, at *9 (W.D. Pa. June 21, 2011) (dismissing a claim based on denial of right to attend Muslim services); *Gould v. Beard*, No. 07 civ. 0055, 2010 WL 845566, at *6 (W.D. Pa. Jan. 16, 2010) (holding that a prisoner did not have a right to communal Nation of Islam services); *Morris-El v. Menei*, No. 00 civ. 200J, 2006 WL 1455592, at *2-6 (W.D. Pa. May 22, 2006) (denying claim that failure to provide Moorish Science services violated the inmate's right to Free Exercise).

[22] Sharp further argues that, pursuant to *Grant v. City of Pittsburgh*, the Magistrate Judge erred by not conducting a careful examination of the record and detailing a factual description of each defendant's actions.  98 F.3d 116 (3d Cir. 1996) (denying qualified immunity because the district court did not analyze the specific conduct of each defendant).  This is a red herring.  Although the Magistrate Judge did state in a

Accordingly, Defendants are entitled to qualified immunity as to Sharp's First Amendment Action.[23]

conclusory fashion that "the evidence shows that the Defendants acted reasonably," she only did so after making factual findings as to the involvement of each SCI-Pittsburgh and Greene Defendant with respect to Sharp's First Amendment Action. Thus, the Magistrate Judge did conduct a proper examination of the record.

[23] Sharp's informal brief also expressly asserted that the Magistrate Judge erred when she: (1) determined that he waived his retaliation claim; and (2) dismissed his due process claim. We disagree.

Prior to trial, the Magistrate Judge found that Sharp's amended complaint did not include any retaliation claims in the section identified as "Legal Claims." The Magistrate Judge was unsure whether this omission was intentional. Thus, the Magistrate Judge directed Sharp to "identify any retaliation claim he intends to pursue in a separate paragraph within the section of his [second amended complaint] wherein he sets forth his legal claims." Sharp, who was represented by counsel at that time, filed his second amended complaint, but did not include retaliation claims in the legal claims section. Sharp never sought to amend his second amended complaint to include a retaliation claim. Because Sharp omitted his retaliation claim in his second amended complaint, the Magistrate Judge did not err in concluding that Sharp waived this claim.

The Magistrate Judge also did not err in granting Defendants' motion for summary judgment on Sharp's due

## III. CONCLUSION

For the reasons set forth above, we will affirm the judgment in favor of Defendants.

---

process claim. Sharp claims that his confinement in administrative custody for thirty months violated his Fourteenth Amendment Due Process rights. Sharp, however, failed to demonstrate that he was not afforded proper due process protections. We have previously upheld the constitutionality of the DOC's policy statement 802, which sets forth the policies and procedures for confining inmates to administrative custody and the PRC's periodic review of their status. *See Shoats v. Horn*, 213 F.3d 140, 145-46 (3d Cir. 2000). Sharp has not argued that the DOC's policy statement 802 has been substantively amended since *Shoats* or that the DOC failed to follow this policy.

Accordingly, the Magistrate Judge did not err in determining that he waived his retaliation claim or in dismissing his due process claim.

40