**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-4824
_____

LORENZO OLIVER

v.

DEBRA ROQUET, PSYD,
Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-13-cv-01881)
District Judge: Honorable Jose L. Linares
_____

Argued: April 14, 2016

Before: AMBRO, SMITH* and KRAUSE, *Circuit Judges*

_____

* Honorable D. Brooks Smith, United States Circuit Judge for
the Third Circuit, assumed Chief Judge status on October 1,
2016.

(Filed: May 24, 2017)
_____

David L. DaCosta, Esq.
Francesco Ferrantelli, Jr., Esq.
Gerard A. Hughes, Esq. (Argued)
Office of Attorney General of New Jersey
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
        *Counsel for Appellant*

Stephen A. Fogdall, Esq. (Argued)
Schnader Harrison Segal & Lewis
1600 Market Street
Suite 3600
Philadelphia, PA 19103
        *Amicus Counsel for Appellee*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

A state-employed medical professional charged with assessing the clinical progress of a civilly committed sexually violent predator considered this detainee's First Amendment activities in connection with her recommendation that he not advance to the next phase of his treatment program. On interlocutory appeal, we are asked to determine whether the

2

medical professional has qualified immunity from the resulting First Amendment retaliation claim. Because the detainee has pleaded facts reflecting that the medical professional based her recommendation on the medically relevant collateral consequences of his protected activity, but has not sufficiently pleaded that the recommendation was based on the protected activity itself, the detainee has not alleged the necessary causation to state a prima facie case of retaliation. Accordingly, we will reverse and remand.

**I.**

Appellant Debra Roquet is a psychologist at the Special Treatment Unit (STU) in Avenel, New Jersey, where Lorenzo Oliver, a sexually violent predator with a long history of convictions for both sexual and non-sexual offenses, has been civilly committed to state custody for treatment pursuant to the Sexually Violent Predator Act, N.J. Stat. Ann. §§ 30:4-27.24 to .38. At the STU, treatment takes place in five phases, culminating in the detainee's conditional discharge into the community on successful completion of the program. At least once a year, the Treatment Progress Review Committee (TPRC) interviews each detainee individually and considers a broad range of materials—including reports from and interviews with representatives of the detainee's multidisciplinary treatment team—in order to formulate a recommendation to the Clinical Assessment Review Committee (CARP) about whether the patient should progress to the next step in the treatment program.

Roquet was one of two members of the TPRC and, on its behalf, wrote an eighteen-page report (the "TPRC Report") that described Oliver's condition and recommended that he remain in phase two of treatment. The TPRC Report

3

recognized that this was "not consistent" with the recommendation of Oliver's treatment team, which had suggested that he advance to phase three of treatment, but concluded that Oliver "had not fully met the treatment goals consistent with completion of Phase 2." App. 31. CARP approved the TPRC's recommendation and Oliver thus remained in phase two.

The TPRC Report set forth Oliver's statutorily defined mental abnormalities, noting that he suffers from, among other things, paraphilia and antisocial personality disorder. In addition to providing a detailed overview of Oliver's sexual and non-sexual offenses, diagnostic history, and clinical treatment, the Report summarized the results of the TPRC's hour-long interview with Oliver, including that "[i]n general, it appears that he denies, minimizes or justifies much of his documented offense history," App. 38, and that "[h]e did not demonstrate remorse for his crimes or empathy for his victims," App. 39. The Report noted that when asked to clarify his version of his offense history, Oliver was "confusing and ultimately evasive." App. 41. At one point "[h]e acknowledged that he enjoyed the rapes," App. 41, and at another point he stated that "[h]e 'never' had a rape fantasy" or did not remember if he had, App. 42. The Report also included the following comment:

> [T]he panel observed that Mr. Oliver earlier asserted that he did not regularly participate in one recommended treatment component (AA/NA) because he was too busy. He protested, stating that he is "fully participating in treatment" but he is "constantly writing for other people." He has written "[t]housands of pages" in 30 days. This is because there are "2

4

paralegals here for 500 people." He said that he does this because he wants to help people.

App. 42.

The Report concluded with a section entitled "Clinic Formulation and Treatment Recommendations," which discussed the TPRC's assessment of Oliver's progress and made recommendations for the coming year. This section contained the following passages:

> Note that Mr. Oliver is highly legalistic and knowledgeable, having received training to enable him to help other prisoners with legal matters while incarcerated. Mr. Oliver also has a history of pro se representation in the community. He reports that he gets satisfaction from helping others; however he has a history of abusing the use of his knowledge by charging fees for services, both in prison and in the STU.
>
> . . .
>
> Mr. Oliver continues to be legalistically focused, although he has managed to keep that out of his focus in group most of the time. He continued to dedicate a great deal of time and energy to his role as paralegal providing services to other residents and he also produces a newsletter. As he advances in treatment, Mr. Oliver may need to examine whether this focus deflects from a focus on treatment or whether it is counter-therapeutic in any other way. It is of some concern that he reported problems with officers

5

as result [sic] of these activities given that Mr. Oliver has an institutional history of conflicts with DOC when he was at Avenel that ultimately took precedence over participation in the treatment program. The TPRC wants to see that he is not headed in the same direction at the STU.

App. 46-47.

Proceeding pro se, Oliver filed a complaint in the District of New Jersey asserting five causes of action, only one of which is relevant to this appeal: Oliver alleged—based on the TPRC Report—that Roquet violated his First Amendment right of free speech by refusing to recommend him for phase three treatment in retaliation for his participation in legal activities of two general types—those he conducted on his own behalf, and those he conducted on behalf of other STU residents.

Roquet moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure but did not then assert a qualified immunity defense. The District Court denied the motion to dismiss as to Oliver's First Amendment retaliation claim,[1] concluding that Oliver had "alleged

---

[1] The District Court, without prejudice, did grant Roquet's motion to dismiss as to Oliver's four remaining causes of action alleging violations of his constitutional right of access to courts (Counts One and Two), a violation of his rights under the New Jersey Patients' Bill of Rights, N.J. Stat. Ann. § 30:4–24.2 (Count Four), and a violation of his free speech rights under the New Jersey Civil Rights Act, N.J. Stat.

6

sufficient facts to allow the Court to draw the reasonable inference that his protected conduct was a motivating factor in [Roquet's] decision not to promote him to phase three." *Oliver v. Roquet*, No. 2:13-CV-1881, 2014 WL 1449634, at \*4 (D.N.J. Apr. 14, 2014). Roquet did not appeal that decision.

With permission from the District Court, Oliver filed an amended complaint, which Roquet again moved to dismiss. This time, Roquet did assert a qualified immunity defense, which the District Court declined to consider as Rule 12(g)(2) bars a party from "raising a defense or objection" in a successive motion under Rule 12 "that was available to the party but omitted from its earlier motion." *Oliver v. Roquet*, No. 2:13-CV-1881, 2014 WL 4271628, at \*2 (D.N.J. Aug. 28, 2014). The District Court thus denied Roquet's motion to dismiss, but explained that Roquet could raise a qualified immunity defense in a motion for judgment on the pleadings under Rule 12(c) or a motion for summary judgment pursuant to Rule 56(a). *Id.* at \*3.

Roquet did not appeal those rulings but instead re-asserted her qualified immunity defense in a motion for summary judgment. Oliver responded by requesting discovery concerning that defense, a request the District Court construed as a motion to defer the summary judgment motion and to allow discovery under Rule 56(d). Although the District Court acknowledged that "courts have a preference for resolving questions of qualified immunity before discovery is ordered," it concluded that "in this particular case, without any discovery, this Pro Se Plaintiff would be foreclosed from being

Ann. § 10:6–2 (Count Five). *Oliver v. Roquet*, No. 2:13-CV-1881, 2014 WL 1449634, at \*2-5 (D.N.J. Apr. 14, 2014).

7

able to show that there is a question of fact as to whether Defendant knowingly violated his right to free speech." App. 3. The District Court therefore denied Roquet's motion for summary judgment without prejudice, instructed the parties to meet and confer on discovery issues, and noted that Roquet would be permitted to re-file her motion after discovery. Roquet timely answered Oliver's amended complaint and filed this appeal, and we appointed amicus curiae to assist Oliver in appellate proceedings.[2]

We exercise plenary review over a District Court's denial of summary judgment. *Levy v. Sterling Holding Co.,* 544 F.3d 493, 501 (3d Cir. 2008). Summary judgment "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). We review a District Court's decision to grant discovery under Rule 56(d) for abuse of discretion. *Murphy v. Millennium Radio Grp.,* 650 F.3d 295, 309-10 (3d Cir. 2011).

## II.

We begin by addressing whether we have jurisdiction to hear this appeal. Because we conclude we do, we then consider whether the District Court properly ordered discovery instead

---

[2] We express our gratitude to Stephen A. Fogdall of Schnader Harrison Segal & Lewis LLP for accepting this matter *pro bono* and for the quality of his briefing and argument in this case. Lawyers who act *pro bono* fulfill the highest service that members of the bar can offer to indigent parties and to the legal profession.

of granting summary judgment to Roquet based on her qualified immunity claim.

**A.**

Government officials are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)). When the defense of qualified immunity is raised and denied, a defendant is generally entitled to an immediate appeal under the collateral order doctrine so long as the denial turns on an issue of law. *Walker v. Horn*, 286 F.3d 705, 710 (3d Cir. 2002).

Here, the District Court said it was not denying qualified immunity, but rather was postponing its decision because, without discovery, Oliver would be "foreclosed from being able to show that there is a question of fact as to whether Defendant knowingly violated his right to free speech." App. 3. In light of that ruling, Oliver and amicus argue we lack jurisdiction over Roquet's appeal because: (1) Roquet did not timely raise qualified immunity; (2) Roquet's defense of qualified immunity has not been denied; and (3) even if Roquet's qualified immunity defense were denied, it was denied on a factual, not legal, basis. None of these arguments withstand scrutiny.

First, although amicus makes much of the fact that Roquet did not assert qualified immunity in her first motion to dismiss, "there is no firm rule" as to when a defendant must raise this affirmative defense, *Sharp*, 669 F.3d at 158, and the defense is not necessarily waived by a defendant who raises it

9

later in the case, *Eddy v. V.I. Water & Power Auth.*, 256 F.3d 204, 210 (3d Cir. 2001). Indeed, it may be raised even after trial if the plaintiff suffers no prejudice. *Sharp,* 669 F.3d at 158. Thus, Roquet's failure to assert qualified immunity at an earlier stage does not divest us of jurisdiction over her immediate appeal.[3]

---

[3] It is also true, of course, that once a party has filed a motion to dismiss under Rule 12 of the Federal Rules of Civil Procedure, that party, with limited exceptions, "must not make another [such motion] raising a defense or objection that was available to the party but omitted from its earlier motion," Fed. R. Civ. P. 12(g)(2), and we are troubled by what could be viewed as an end run around this prohibition in Appellant's re-designation of her second motion to dismiss as a "motion for summary judgment." We note, however, that a defense omitted from an earlier motion may nonetheless be raised in a motion for judgment on the pleadings, Fed. R. Civ. P. 12(h)(2); *Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 322 (3d Cir. 2015), and that the District Court, in rejecting Roquet's second motion to dismiss, specifically instructed that "[t]o the extent that Defendant wishes to raise a qualified immunity defense, she may do so in a motion for judgment on the pleadings pursuant to Rule 12(c) or a motion for summary judgment pursuant to Rule 56(a)," *Oliver*, 2014 WL 4271628, at *3. Given the absence of discovery, Roquet's motion perhaps more properly should have been designated as the former and the District Court might have rejected it on technical grounds. But as the District Judge opted to deny it on the merits, in effect treating it as a motion for judgment on the pleadings and rejecting the legal defense it asserted in favor of discovery, we

Second, qualified immunity may be "denied," giving rise to appellate jurisdiction, not only where the denial is express. In *In re Montgomery County*, this Court joined numerous other Courts of Appeals in holding that a district court's "implicit denial of the Appellants' immunity claims is sufficient to confer appellate jurisdiction." *Wright v. Montgomery Cty.* (*In re Montgomery Cty*.), 215 F.3d 367, 370, 374 (3d Cir. 2000); *see also Brown v. Armenti*, 247 F.3d 69, 72 n.1 (3d Cir. 2001) ("Even though a district court does not explicitly address the immunity claims [in denying summary judgment], we nonetheless have jurisdiction to review the implied denial of those claims."). And qualified immunity may be implicitly denied when a government official otherwise entitled to immunity is nonetheless subjected to "the burdens of such *pretrial* matters as discovery." *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (internal quotation marks omitted). That is, unless the plaintiff's allegations state a claim of violation of clearly established law, "a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), and a refusal to dismiss is a ruling "conclusive as to this right," for which immediate appeal must be available, *Behrens*, 516 U.S. at 308; *see also Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987) (concluding that if the actions alleged "are actions that a reasonable officer could have believed lawful . . . then [the officer] is entitled to dismissal prior to discovery").

Third, Roquet's qualified immunity defense was not denied on a factual basis but rather on an appealable legal

---

too will deem the defense timely raised and, as further discussed below, implicitly denied.

11

ground. As explained above, the District Court granted discovery, reasoning that without it Oliver "would be foreclosed from being able to show that there is a question of fact as to whether [Roquet] knowingly violated his right to free speech." App. 3. This ruling "may be separated into legal and factual components." *Eddy*, 256 F.3d at 211. The factual component, apparent on the face of the order, pertains to the question of whether Roquet's violation of Oliver's right to free speech was knowing. But the legal component, implicit in that ruling, is the District Court's conclusion that Oliver had adequately pleaded such a violation and that the right violated was then "clearly established." *Sharp*, 669 F.3d at 159 (quoting *Pearson*, 555 U.S. at 231). If Oliver's complaint did not satisfy that legal component, then Roquet was entitled to qualified immunity as a matter of law, the District Court's denial of summary judgment was erroneous, and its decision to grant discovery under Rule 56(d) was necessarily an abuse of discretion.[4]

Having satisfied any concern as to our jurisdiction, we turn to the question of whether Roquet was entitled to qualified immunity.

---

[4] "[T]he fact that we have jurisdiction to review the Appellant['s] immunity claims does not automatically mean that we should also decide them," but resolution is preferable to remand where, as here, "the issues are purely legal and ripe for review," such that there is "little benefit in requiring th[i]s[] Appellant[] to press [her] claims anew in the District Court, and to risk yet further delay should that court's ultimate decision lead to a subsequent appeal." *In re Montgomery Cty.*, 215 F.3d at 374-75.

**B.**

We start by considering whether Oliver has sufficiently alleged a violation of his First Amendment rights. This analysis requires us to "outline the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). We will then "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth," and assuming the veracity of the well-pled factual allegations that remain, "'determine whether they plausibly give rise to an entitlement to relief.'" *id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

**1.**

Mindful of the differences between the incarcerated and the civilly confined,[5] we are nonetheless persuaded that prisoner retaliation actions are an appropriate starting point for our analysis of the elements of Oliver's cause of action. "Retaliating against a prisoner for the exercise of his constitutional rights is unconstitutional," *Bistrian*, 696 F.3d at 376, and this is of course no less true where the retaliation is directed against a civilly committed person, *see Disability*

---

[5] As the Supreme Court has explained, "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982); *see also Kansas v. Hendricks*, 521 U.S. 346, 361-62 (1997) (holding that the commitment of a sexually violent predator under state statute did not implicate the objectives of criminal punishment).

*Rights N.J., Inc. v. Comm'r, N.J. Dep't of Human Servs.*, 796 F.3d 293, 297 (3d Cir. 2015) ("[C]ommitted individuals are entitled to at least as much constitutional protection in this context as prisoners."); *cf. Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982) ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions.").

To state a First Amendment retaliation claim, a prisoner plaintiff must allege (1) "that the conduct which led to the alleged retaliation was constitutionally protected"; (2) "that he suffered some 'adverse action' at the hands of the prison officials"; and (3) "a causal link between the exercise of his constitutional rights and the adverse action taken against him," or more specifically, "that his constitutionally protected conduct was 'a substantial or motivating factor' in the decision" to take that action. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Once the prisoner has made his prima facie case, the burden shifts to the defendant to prove by a preponderance of the evidence that it "would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Id*. at 334.

In this case, the parties dispute what is required under the causation prong of the *Rauser* test and whether Oliver has alleged facts giving rise to the inference that his protected activity was a "substantial or motivating factor" in the decision not to advance him.[6] The challenge here is that, although

---

[6] Although the parties agree that Oliver has sufficiently alleged his engagement in protected legal activity, they disagree and devote much of their briefs to the question of

14

Oliver makes the conclusory allegation in his complaint that he suffered an adverse action based on his protected activity, the facts that Oliver alleges to support that causal link are drawn from the TPRC Report, and nothing in the Report—which we may consider in its entirety in this context as a "document integral to or explicitly relied upon in the complaint," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted)—suggests that Oliver's litigation activity itself was the basis of Roquet's recommendation.[7] Rather, on its face, the Report reflects that, to the extent Roquet considered Oliver's litigation activity in recommending against his advancement, it was only to note

---

whether Roquet's recommendation that Oliver remain in the second phase of treatment constituted an adverse action. Roquet argues that "[a] non-binding recommendation cannot possibly be an adverse action to which one is 'subjected,'" Appellant's Br. 15, while Oliver argues that CARP's decision "relie[d] totally on the TPRC's [R]eport," Appellee's Br. 13. Given our conclusion as to the causation prong in this case, we need not decide whether Roquet's recommendation was "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights," such that it would qualify as an adverse action. *Brightwell v. Lehman*, 637 F.3d 187, 194 (3d Cir. 2011) (internal quotation marks omitted).

[7] While Oliver refers only to certain sections of the Report in his amended complaint, Roquet included the entire Report in the appendix to her motion, and we "may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document," *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

15

that certain problematic behaviors on which the recommendation was based—including Oliver being distracted from his treatment, his manipulative behavior, and his hostile relationship with STU staff—manifested themselves in Oliver's litigation activities.

Oliver does not argue that it was impermissible for Roquet to base her recommendation on those behaviors; instead, his argument seems to be that because the Report reflects that Roquet identified his litigation activity as associated with those behaviors, Oliver has sufficiently pleaded causation. In other words, Oliver contends that by alleging a medical professional considered protected activity at all, even if only as a symptom of or giving rise to medically relevant behaviors, a plaintiff can satisfy *Rauser*'s causation prong at the pleading stage. That cannot be, and is not, the law. To understand why more is needed in this context, we briefly review the Supreme Court's and our jurisprudence related to this causation question.

We derived the *Rauser* framework, in significant part, from *Mount Healthy Board of Education v. Doyle*, 429 U.S. 274 (1977), the Supreme Court's decision on retaliation claims arising in the public employment context. The tests developed by the Court in *Mount Healthy* and our Court in *Rauser* to assess retaliation claims reflect the premise that protected activity is virtually never a permissible basis for state employees to take adverse action, much the way protected characteristics like race or sex are presumptively invalid bases for state action in the discrimination context. *See, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999); *see also Wilkie v. Robbins*, 551 U.S. 537, 556 (2007) (drawing a parallel between the "methods for identifying the

16

presence of an illicit reason" established by the Supreme Court in the retaliation and discrimination contexts). Because it is generally impermissible for a state actor to hinge an adverse decision on such an activity or characteristic, any consideration of the activity or characteristic in the decision-making process leading to the adverse action is, in the normal course, sufficient to satisfy the causation element of a prima facie retaliation or discrimination case. *See, e.g.*, *Mt. Healthy*, 429 U.S. at 282-87*; Pryor v. Nat'l Collegiate Athletic Ass'n*., 288 F.3d 548, 560-61 (3d Cir. 2002).

This premise makes sense in most cases, as there is rarely a valid reason for a state actor to even consider a person's protected activity or characteristics like race and gender when evaluating if an adverse action is appropriate. The Supreme Court has acknowledged, however, that there will be exceptions to this general rule, and that allegations of mere consideration of protected activity will not always be enough to plead causation in a retaliation case. Instead, as the Court explained in *Hartman v. Moore*, the necessary "proof of a connection" between the protected activity and the adverse action will "depend on the circumstances."[8] 547 U.S. 250, 263 (2006).

---

[8] In that case, the Supreme Court adjusted the requirements of the causation prong of a prima facie retaliation claim to reflect the unique circumstances of a retaliatory prosecution claim against a federal agent, which the Court recognized presented an unusual problem because a plaintiff may only bring the claim against a non-prosecuting government agent, rather than the prosecutor himself, even though it is ultimately the prosecutor's decision whether or not to bring criminal charges. *Id.* at 263. Although the Court

17

When evaluating what allegations will satisfy this requirement, we also must consider the pleading standards set forth in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, a plaintiff's allegations "must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and must reflect "more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678. A plaintiff's "bare assertions . . . amount[ing to] nothing more than a 'formulaic recitation of the elements' of a constitutional [retaliation] claim," will not suffice. *Id* at 681 (quoting *Twombly*, 550 U.S. at 555).

With these standards in mind, it is clear that, in the context of a retaliation claim against a mental health professional at a state institution, a prima facie showing of causation requires more than the allegation that the professional based a medical decision on symptomology that happened to relate in some way to a patient's protected activity. There must be particular facts alleged that allow the court to reasonably infer it is the protected activity itself, and not simply medically relevant behavior associated with that activity, that formed the basis of the defendant's adverse action. This is so because a medical professional's holistic

acknowledged that the requirement it was adding, a showing of the absence of probable cause to prosecute, would "not necessarily [be] dispositive" in every case, *id.* at 265, it also observed that the "complexity" of the causation issue needed to be "addressed specifically in defining the elements of the tort," *id.*, and therefore concluded "it makes sense to require such a showing as an element of a plaintiff's case . . . that [] must be pleaded and proven," *id.* at 265-66.

approach to diagnosing a patient's mental health will sometimes require consideration of his otherwise protected speech and conduct to evaluate any adverse consequences they are having on his treatment. Framed in terms of the *Rauser* test and the relevant pleading standards, an assertion by a mental health detainee that his treating psychologist retaliated against him, based only on the factual allegation that the psychologist considered the effect his First Amendment activity was having on his treatment, would not support the inference that retaliation was the "substantial or motivating factor" for the psychologist's recommendation.

Suppose, for example, that a state-employed psychologist ordered continued detention and treatment of a detainee with paranoid schizophrenia based, among other things, on her observation that the detainee's obsessive filing of complaints alleging conspiracy theories was symptomatic of continued paranoia and had consumed his time to the exclusion of therapeutic activities. We could hardly say the psychologist's "consideration of" the detainee's protected activity—to the extent the psychologist simply noted its association with the symptomology on which her medical decision was based—was sufficient alone to plead causation and to create an inference of retaliation. Indeed, to conclude otherwise would create a perverse incentive for psychologists to ignore medically relevant detainee behaviors simply because those behaviors coincidentally involve conduct protected by the First Amendment. As demonstrated by this example, the mere allegation that a mental health professional considered a patient's protected activity to be associated in some way with the medically relevant conduct on which the adverse action, on its face, was based will not raise the patient's right to relief "above the speculative level." *Twombly*, 550 U.S. at 555.

Our holding is also supported by the Supreme Court's repeated admonitions that we owe deference to medical professionals in both the prison and civil commitment contexts. *See Washington v. Harper*, 494 U.S. 210, 232 (1990); *Parham v. J. R.*, 442 U.S. 584, 607 (1979). Most notably, in *Youngberg v. Romeo*, 457 U.S. 307 (1982), because of the special expertise of medical professionals regarding those institutionally committed to their care—and the need to minimize "interference by the federal judiciary with the internal operations of [state] institutions"—the Supreme Court stressed judicial deference to their treatment decisions and expressed concerns about imposing upon them standards that would force them to make judgments "in the shadow of" legal liability. *Id.* at 322, 325. To determine whether intellectually disabled individuals who have been involuntarily committed can recover damages against doctors and other experts responsible for their treatment, the Court ultimately held in that case that medical professionals' decisions are "presumptively valid" and "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. Requiring that a prima facie case of retaliation involve more than just the allegation that a psychologist took account of facially relevant medical behaviors—including those associated in some way with a patient's protected activity—is consistent with the "presumptive validity" we accord to these professionals' medical judgment.

This requirement for pleading causation in the context of a mental health professional's clinical decisions also aligns with New Jersey's legitimate state interest in providing

20

appropriate rehabilitation to sexually violent offenders. New Jersey's statutory system is designed to balance the rights of the individual with "the purpose of ensuring that the person participates in necessary treatment and that the person does not represent a risk to public safety." N.J. Stat. Ann. § 30:4-27.32(c)(2). The same provision that charges the STU with "provid[ing] or arrang[ing] for custodial care" of sexually violent predators specifies that "the rights and rules of conduct applicable to a person subject to involuntary commitment as a sexually violent predator" are to be established by regulations that "specifically address the differing needs and specific characteristics of, and treatment protocols related to, sexually violent predators." *Id.* § 30:4-27.34(a), (d). In short, the constitutional rights of those committed under the state statute are not absolute but are subject to treatment protocols designed to ensure fulfillment of the objectives of their commitment and rehabilitation. To hold that a prima facie case of retaliation could be established merely by alleging that a medical professional considered the effect a detainee's protected activity was having on his treatment would motivate those responsible for administering this system to refrain from addressing behavior often pertinent to a detainee's treatment and would undercut New Jersey's legitimate interest in rehabilitating its sexually violent offenders.

For all of these reasons, we conclude that in order to satisfy the third element of a prima facie case under *Rauser*—that the plaintiff's protected activity was a "substantial or motivating factor" for the defendant's adverse action—Oliver must allege that it is his protected activity itself, not just the medically relevant collateral consequences of that activity, that played a role in Roquet's recommendation not to advance

21

him.[9]  We now proceed to determine whether Oliver has met this burden.

**2.**

Applying these principles here, we conclude that Oliver has failed to state a retaliation claim.  No facts on the face of Oliver's complaint or the TPRC Report suggest that Oliver's protected activity itself, rather than medically relevant collateral consequences of that activity, was the basis of Roquet's recommendation.  The Report expresses concern that Oliver's litigation activity is a significant distraction from his treatment, as Oliver's own comments reflect that he is so

---

[9] Some Courts of Appeals have arrived at a similar result at the summary judgment stage, holding that liability cannot be imposed where a medical professional considers a detainee's protected expression for legitimate reasons concerning the implications of that expression for the detainee's mental health. *See, e.g.*, *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) (affirming a grant of summary judgment to a state mental health evaluator where the detainee plaintiff alleged the evaluator violated his First Amendment rights by basing his conclusion that the detainee was delusional and recommendation that detainee be taken into custody on political statements detainee made on an online social media website).  For the reasons discussed above, however, we conclude that—at least in the context of mental health evaluations of the civilly committed, which is the only context we address today—whether a detainee's allegations reflect consideration of his protected activity itself or only the collateral consequences of such activity is appropriately addressed in connection with causation at the pleading stage.

consumed by his legal activities that he failed to participate in a recommended component of his treatment program. The Report further reflects that Oliver has manipulated other inmates and abused the power these activities vest in him by charging fees for legal services both during his prior incarceration and his current civil confinement, and that he has created hostility with officers at the program through his protected activity. Roquet elaborated that she found Oliver's acknowledged conflicts with the STU staff particularly concerning, as he has a "history" of similar animosity and these conflicts "ultimately took precedence over [Oliver's] participating in the treatment program" in the past. App. 47.

Oliver has not alleged that any of these medical observations, which appear to be appropriate and reasonable on their face, are not true or are exaggerated. Instead, he simply asserts that Roquet's description of him as "legalistic," and her observation that he devotes a lot of his time to his litigation activities, "are clearly directed at [Oliver's] legal activit[y]" itself. App. 17-18. This unsupported conclusory assertion based on statements taken largely out of context is not sufficient to plead causation.

We recognize there may be cases where a medical report purporting to focus only on the collateral consequences of a detainee's First Amendment activity could be sufficient to establish a prima facie case of retaliation plaintiff where the plaintiff is able to plead "consideration plus,"—i.e., where, in addition to consideration of the protected activity by way of its association with medically relevant conduct, there are specific factual allegations supporting an inference that the adverse action was based on the protected activity itself. For example, a prima facie case might be established if there were specific

factual allegations suggesting that the collateral consequences were fabricated, that the defendant had communicated anger or frustration with the protected activity itself or had threatened to take action against the plaintiff, or that the collateral consequences relied upon were irrelevant to the medical judgment in question.

Here, however, to the extent any such "plus" factors can be gleaned from Oliver's complaint, they amount to no more than speculation that Roquet based her recommendation on anything other than the medically relevant conduct that pervades her report. For example, Oliver identifies specific instances of protected activity in which he engaged prior to Roquet's recommendation not to advance him, alleging that Roquet "deprived [him] of his [c]onstitutional [r]ights" because he wrote articles in a newsletter, filed a petition to remove class counsel in an unrelated civil rights case, and assisted other residents in their filing of legal grievances against the STU. App. 23. But these allegations plead the element of protected activity, not causation, and the conclusory statement that this activity is what deprived him of his constitutional rights is exactly the type of "bare assertion[]" that the Supreme Court has held amounts to "nothing more than a formulaic recitation of the elements of a constitutional [retaliation] claim." *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 555).

Oliver also alleges that he has assisted other detainees in their suits against various other members of the TPRC, including another doctor who is a friend of Roquet's. But where Roquet was not the subject of, or involved with, those complaints in any way, those allegations support nothing more than "a sheer possibility" that Roquet had a motive to retaliate

24

against him, *Iqbal*, 556 U.S. at 678, and cannot stand in for a causal link that is missing. Absent supporting facts that make it reasonable to draw an inference of retaliation, these conclusory assertions of a cause-and-effect relationship between specific protected activities and a later adverse action are insufficient to plead causation. *Twombly*, 550 U.S. at 555; *see also Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 253 (3d Cir. 2017) (holding that allegations "sufficient to raise the inference that [plaintiff's] engagement in a protected activity was the *likely reason* for the [defendant's] adverse action" are necessary to state a prima facie claim of retaliation under Title VII).

Perhaps in an attempt to establish, by process of elimination, that only a retaliatory motive could account for Roquet's recommendation, Oliver also alleges that he met all of the goals and expectations outlined in the STU Residents Handbook. But again, Oliver offers but a bare allegation, which the TPRC Report that forms the basis for his complaint overwhelmingly contradicts. For example, among these goals and expectations is that the offender show "[s]ome acknowledgment of sexual offense history" and "[a]cceptance of at least some personal responsibility for sexual assaults," App. 20, but, according to the Report, Oliver "denies, minimizes or justifies much of his documented offense history," App. 38, "did not demonstrate remorse for his crimes or empathy for his victims," App. 39, and was "confusing and ultimately evasive" about his offense history, App. 41.[10]

---

[10] Oliver also makes additional allegations for the first time in an affidavit attached to his appellate brief about an ex parte interaction he had with Roquet after her colleague had left the interview room. Whatever concerns we would

In short, Oliver has not sufficiently alleged any direct "causal link" between Roquet's recommendation and his First Amendment protected activities. *Rauser*, 241 F.3d at 333. Instead, the "causal link" Oliver alleges is between the recommendation and facially legitimate and uncontested medical observations that, by happenstance, result from those activities, and, absent allegations supporting a reasonable inference that Roquet based her recommendation on anything other than reasonable medical judgment, Oliver has not pleaded the causation required to state a prima facie claim of retaliation.

## C.

Even if Oliver had adequately stated a retaliation claim, he could not prevail because the right that he asserts was violated was not clearly established at the time Roquet wrote the TPRC Report. A right is clearly established if "its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Sharp*, 669 F.3d at 159 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). This inquiry requires us to "define the right allegedly

---

otherwise have with the introduction of this self-serving document on appeal, we do not recognize facts outside of the record and no such allegation appears in the complaint or any document before the District Court. While we would always look skeptically at self-serving facts introduced in the middle of the litigation and only in the plaintiff's own affidavit, "[w]e do not consider material on appeal that is outside of the district court record." *Webb v. City of Phila.*, 562 F.3d 256, 261 n.4 (3d Cir. 2009).

violated at the appropriate level of specificity," *id.*, that is, "'in light of the specific context of the case, not as a broad general proposition,'" *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 248 (3d Cir. 2016) (quoting *Saucier*, 533 U.S. at 201).

Here, Oliver alleges that Roquet violated his First Amendment rights merely by identifying ways in which his legal activities affected his treatment and considering those observations among others in making a medical recommendation. In the absence of facts supporting an improper motive, the right asserted by Oliver appears to be the right of a civilly committed detainee to be assessed for treatment progress without consideration of any medical consequences of his legal activities. But "we have never indicated, let alone clearly established," such a right. *Sharp*, 669 F.3d at 160. And, for the reasons explained, medical professionals cannot be prohibited from taking into account such activities to the extent those activities on their face bear on the clinical assessments such professionals have been charged with rendering. Necessarily, then, a reasonable STU psychologist in Roquet's position would not have understood she was violating a constitutional right by basing her recommendation, at least in part, on the effects of Oliver's legal activities on his medical progress. For this reason as well, Roquet is entitled to qualified immunity.

## III.

For the foregoing reasons, we will reverse the District Court's order granting Oliver discovery and remand the case for proceedings consistent with this opinion.

27