**NON-PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2327
_____

DONALD JACOBS,
                    Appellant

v.

COUNTY OF BUCKS; JOSEPH KHAN; MARGARET MCKEVITT
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 5-20-cv-04016)
U.S. District Judge:  Honorable Edward G. Smith
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on May 16, 2023
_____

Before:  SHWARTZ, MONTGOMERY-REEVES, and ROTH, <u>Circuit Judges</u>.

(Filed:  July 10, 2023)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

SHWARTZ, <u>Circuit Judge</u>.

Donald Jacobs sued the County of Bucks (the "County"), its Chief Operating Officer ("COO"), and its Solicitor (collectively, "Defendants"), under the Family and Medical Leave Act ("FMLA"), 42 U.S.C. § 1983, and Pennsylvania's Whistleblower Law.[1]  Because the District Court properly granted Defendants' motion for summary judgment on the two federal claims and acted within its discretion in declining to exercise supplemental jurisdiction over the state whistleblower claim, we will affirm.

I

A

Jacobs served as the County's Chief Information Officer ("CIO").  As the CIO, he was responsible for, among other things, "maintain[ing] the operation of" and "procuring services" for the Information Technology ("IT") Department.  App. 391.

In 2012, Jacobs began working with Robert Ayers, an information technology professional then-employed by the Commonwealth of Pennsylvania.  That year, and again in 2016, Ayers assisted the County in responding to a malware cyber-attack.  Ayers later told Jacobs that he could privately provide services to the County.  Jacobs was receptive because he thought Ayers' prior work for the County was "wonderful."  App. 408.

---

[1] Margaret McKevitt is the COO, and Joseph Khan is the Solicitor.  McKevitt became the interim COO on February 14, 2020, and the permanent COO in March 2020. The COO is the highest-ranking non-elected official in the County.

Jacobs thereafter spoke with his supervisors, David Boscola, the County's Chief Financial Officer ("CFO"), and Brian Hessenthaler, the COO prior to Margaret McKevitt, about retaining a cyber-security consultant. Both Boscola and Hessenthaler specifically opposed contracting with Ayers. Jacobs knew that Hessenthaler was "[a]bsolutely dead set" against using Ayers because he believed a state employee should not be contracted to independently provide services to the County, as that would present a conflict of interest. App. 406.

Nonetheless, later in 2016, Ayers began providing services to the County through a private company called CyberRisk Services ("CRS").[2] Jacobs oversaw Ayers' private contract work for the County without Hessenthaler or Boscola's knowledge through at least 2018 and approved CRS invoices.[3] Jacobs also recommended Ayers as a private contractor to other government offices but did not mention Ayers' concurrent state employment.

_____

[2] In November 2016, one employee complained to Jacobs about Ayers' firm, stating that he did not "appreciate being used after hours to assist [Ayers] with enriching himself at my and County expense." App. 514. The employee also expressed his view that if Ayers' private work "conflicts with his primary employment as a PA State employee then he needs to reevaluate that commitment and the one he made with the County of Bucks. You can tell him this or I will, you[]r[] choice." App. 514. Directly below the email was a forwarded message from "Robert Ayers" whose email address was "rayers@cyber-risk-services.com." App. 514. At this point, at the latest, Jacobs was on full notice that Ayers was related to CRS. Despite his knowledge, Jacobs did not advise Hessenthaler or Boscola of Ayers' connection to CRS.

[3] Jacobs had the authority to unilaterally approve contracts below a certain dollar amount. While the County Commissioners approved two subsequent CRS invoices, Boscola did not know Ayers was involved with CRS at the time. It is unclear exactly when Hessenthaler learned of Ayers' connection to CRS, but Jacobs stated that when he did, Hessenthaler "was livid" and "lost all faith in [Jacobs]." App. 408.

In September 2019, Jacobs communicated with a potential software vendor that also had a relationship with Ayers. The vendor stated that any contract would result in a ten-percent finder's fee "paid to Robert Ayers [at] Cyber Risk Services LLC . . . as he is the one who initiated this opportunity." App. 582. Jacobs raised the finder's fee with two members of the Bucks County Solicitor's Office, but one member stated that Ayers' identity was never disclosed. Ultimately, the County did not contract with the vendor.

B

During his employment, Jacobs applied for and was granted FMLA leave on several occasions. Relevant here, on January 8, 2020, Jacobs emailed various County employees, including Hessenthaler and Boscola, stating that he would need to be out of the office for cancer treatment on certain dates. On January 9, 2020, Jacobs submitted a request for intermittent FMLA leave to the County's health insurance claims processor. The request was granted the following week, subject to the requirement that Jacobs' health care provider submit certain documentation by January 25, 2020.[4] On February 4, 2020, the County denied Jacobs' request because the claims processor did not receive the requisite documentation.[5]

C

---

[4] The County's human resources department reminded Jacobs of this requirement at least once before the deadline.

[5] Shortly before becoming interim COO on February 14, 2020, McKevitt learned that Jacobs had not attended a meeting due to receiving cancer treatment, but she could not recall when she first learned he was on medical leave.

On January 16, 2020, investigators for the Pennsylvania State Ethics Commission interviewed Jacobs in connection with Ayers' alleged use of his state employment for private financial gain.[6] Around the same time, the County initiated its own investigation into, among other things, Jacobs' relationship with Ayers. The County's investigation team included McKevitt, Joseph Khan, and Virginia Hardwick, an attorney from the Solicitor's Office.

On February 21, 2020, McKevitt, Khan, and Hardwick interviewed Jacobs about Ayers and the finder's fee issue ("February Interview"). According to Khan, Jacobs made several "false statements" on those topics, including that "no one had raised concerns or objections to the relationship between Mr. Ayers and the IT Department and the County." App. 803-04. Except for Jacobs, no party to the February Interview remembers any mention of his FMLA leave or upcoming surgery. Jacobs recalls that when his FMLA leave was mentioned, McKevitt "rolled her eyes and waved [him] off." App. 351.

At the conclusion of the February Interview, Jacobs was told he had been placed on administrative leave pending further investigation. On March 2, 2020, the County

---

[6] Jacobs gave conflicting accounts to the investigators as to how and when he first learned that Ayers was behind CRS and when and whether he told Hessenthaler about Ayers' relationship with CRS. Jacobs also told the investigators that "Brian [Hessenthaler] was so right [about Ayers]. Brian was right . . . . Yeah, I f[ ]d up. I should've listened to him right off the bat." App. 426.

issued a letter terminating Jacobs and providing several reasons for termination.[7] As a result, Jacobs applied for unemployment benefits and filed suit.

D

Jacobs alleged that the termination of his employment constituted, among other things, (1) retaliation under the FMLA; (2) a violation of § 1983 under the Fourteenth Amendment;[8] and (3) a violation of Pennsylvania's whistleblower law. After discovery, Defendants moved for summary judgment on all counts.

The District Court granted the motion, holding (1) the FMLA retaliation claim failed because Jacobs did not identify facts from which a jury could infer a causal link between his termination and his invocation of his FMLA rights, Jacobs v. Cnty. of Bucks, 20-CV-4016, 2022 WL 2239960, at *6-7 (E.D. Pa. June 22, 2022); (2) the § 1983 claim failed because McKevitt and Khan did not violate the Fourteenth Amendment and thus they were entitled to qualified immunity, id. at *8-11; and (3) there was no reason to exercise supplemental jurisdiction over the state whistleblower claim, id. at *11.[9]

Jacobs appeals.

---

[7] The reasons included, among other things, dishonesty, providing incomplete, misleading, or incorrect information, insubordination, failure to report illegal or inappropriate activity, and violation of human resources policies.

[8] The § 1983 claim was asserted only against McKevitt and Khan.

[9] Jacobs does not appeal the District Court's order granting summary judgment on his FMLA interference or First Amendment claims, and thus the claims are waived. Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist., 877 F.3d 136, 148 (3d Cir. 2017).

II[10]

A

We will first review Jacobs' FMLA retaliation claim. An "FMLA retaliation claim is assessed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Capps v. Mondelez Glob., LLC, 847 F.3d 144, 151 (3d Cir. 2017). Under that framework, a plaintiff must first establish a prima facie case, which requires him to show that (1) "he invoked his right to FMLA-qualifying leave, (2) he suffered an adverse employment [action], and (3) the adverse action was causally related to his invocation of rights." Id. at 152 n.6. "If the plaintiff succeeds, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action. [If the defendant does so,] [t]he burden then shifts back to the plaintiff to [show] . . . that the articulated reason was a mere pretext for discrimination." Id. at 152 (quoting Ross v. Gilhuly, 755 F.3d 185, 193 (3d Cir. 2014)).

Defendants do not contest that Jacobs has satisfied the invocation and adverse

---

[10] The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. We review a district court's order granting summary judgment de novo, Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 418 (3d Cir. 2013), and we view the facts and make all reasonable inferences in the non-movant's favor, Hugh v. Butler Cnty. Fam. YMCA, 418 F.3d 265, 267 (3d Cir. 2005). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Additionally, we review the District Court's refusal to exercise supplemental jurisdiction for abuse of discretion. Figueroa v. Buccaneer Hotel Inc., 188 F.3d 172, 175 (3d Cir. 1999).

action elements of the prima facie case. Thus, we must decide whether there are facts upon which a reasonable juror could find a causal link between the adverse employment action and his invocation of his FMLA rights. To determine whether a causal link exists, we consider "timing and evidence of ongoing antagonism." Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 288 (3d Cir. 2001). Unusually close timing between the protected activity and the adverse action may suggest a causal connection. Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 196 (3d Cir. 2015). Absent close temporal proximity, "we consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." Id. (citations omitted).

Here, the timing between the protected activity and the adverse action was not unusually suggestive. Jacobs invoked his FMLA rights on January 9, 2020, when he submitted his request for leave. The County's decision to place Jacobs on administrative leave occurred on February 20, 2020, one day before the February Interview. This gap of forty-two days, or six weeks, does not raise an inference of causation. See, e.g., Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (concluding that "the temporal proximity [was] not so close as to be unduly suggestive" where "over three weeks [had] passed").[11]

_____

[11] Jacobs contends that the real temporal proximity is only nine days because it should be measured between the February Interview during which Jacobs argues McKevitt first became aware of his FMLA leave, and March 2, 2020, the date of Jacobs' termination. This argument is meritless for two reasons. First, the relevant period is the

There is also no evidence of ongoing antagonism or retaliatory animus. To the contrary, Jacobs requested and received FMLA leave on multiple occasions throughout his employment and was denied FMLA leave in 2020 only because he failed to provide the requisite documentation. Jacobs nonetheless contends it is "suspicious" that McKevitt, Khan, and Hardwick do not recall if his medical leave or surgery were discussed at the February Interview. Appellant's Br. at 44-45. Even coupled with McKevitt allegedly rolling her eyes during the February Interview, these failures to recall a discussion about his health do not establish a pattern of antagonism or animus. See Dondero v. Lower Milford Twp., 5 F.4th 355, 362 (3d Cir. 2021) (concluding there was no pattern of antagonism despite, among other things, attempts to eliminate plaintiff's position and the cancellation of his work-provided cell-phone plan).

The County also offered consistent explanations for Jacobs' termination. In fact, the County has repeatedly provided the same reasons for terminating Jacobs, which include its belief that Jacobs was (1) dishonest about his knowledge of, and relationship with, Ayers and (2) insubordinate in continuing to use Ayers for County work.[12] The

_____

time "between [the] protected activity and the adverse action." Daniels, 776 F.3d at 198; LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007). Second, even assuming McKevitt did not learn about Jacobs' FMLA leave until the February Interview, as Jacobs claims, his FMLA request had no relation to the decision to place him on administrative leave because that decision was made before the February Interview. See Daniels, 776 F.3d at 196 ("The plaintiff . . . cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted.").

[12] Jacobs argues that Hessenthaler's directives not to contract with Ayers constitute inadmissible hearsay. This argument lacks merit because "[i]nstructions to an individual to do something are . . . not hearsay, because they are not declarations of fact

9

termination letter, contemporaneous documentary evidence, and deposition testimony reiterate these justifications, demonstrating that the County has provided consistent reasons for Jacobs' termination.[13]  Therefore, viewing the facts in Jacobs' favor, no reasonable juror could find a causal connection between his invocation of his FMLA rights and his termination.[14]

B

We next address Jacobs' claim that his termination jeopardized his reputation, giving rise to a liberty interest under the Fourteenth Amendment.  "[T]o make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest."  Hill v. Borough of Kutztown, 455 F.3d 225, 236 (3d Cir. 2006) (citation omitted).  The "stigma-plus" test may be satisfied in the public employment context by the public dissemination of defamatory statements followed by termination.[15]  Id.  An employee is not deprived of

---

and therefore are not capable of being true or false."  United States v. Reilly, 33 F.3d 1396, 1410 (3d Cir. 1994) (internal citations and quotations omitted).

[13] Jacobs contends that there is a dispute about who placed him on administrative leave, but the question of who executed the decision is irrelevant to whether the County provided inconsistent reasons for that decision.  Jacobs' other argument, that McKevitt and Khan failed to recall specific details about Jacobs' termination, does not mean the stated reasons were inconsistent.  To the contrary, the record shows that Defendants consistently offered the same reasons for Jacobs' termination.

[14] Even if Jacobs established causation, his claim would fail because he has not adduced evidence from "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (quotations omitted).

[15] An employee who shows he suffered reputational damage is entitled to a name-clearing hearing. See Codd v. Velger, 429 U.S. 624, 627-28 (1977); accord Hill, 455 F.3d

10

his liberty interests when "there is no public disclosure of the reasons for the discharge." Bishop v. Wood, 426 U.S. 341, 348 (1976).[16]  Public disclosure means publication "to the general public" and does not include dissemination to entities related to the employer. Chabal v. Reagan, 841 F.2d 1216, 1224 (3d Cir. 1988).

There is no evidence that the reasons for Jacobs' termination were disseminated to the general public.  The record shows that the reasons were discussed only among County employees at the February Interview and were described in the March termination letter.  Insofar as the purportedly stigmatizing reasons for termination have been disclosed through this litigation, or at his unemployment proceeding, neither constitutes a public disclosure upon which Jacobs can seek relief.  Bishop, 426 U.S. at 348 (disclosure of allegedly stigmatizing reasons during litigation "cannot provide retroactive support" for plaintiff's claim); Buntin v. City of Boston, 813 F.3d 401, 407 (1st Cir. 2015) (holding stigma-plus claim failed where there was "no allegation [of publication] beyond the [unemployment] hearings").  Accordingly, Jacobs has not satisfied the public

---

at 236.  Jacobs did not request such a hearing.  Although our sister circuits require a plaintiff to request such a hearing to bring a stigma-plus due process claim, see Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 103 (1st Cir. 2002); Macklin v. City of New Orleans, 300 F.3d 552, 553 (5th Cir. 2002); Quinn v. Shirey, 293 F.3d 315, 323 (6th Cir. 2002); Winskowski v. City of Stephen, 442 F.3d 1107, 1111 (8th Cir. 2006); Johnston v. Borders, 36 F.4th 1254, 1272 (11th Cir. 2022) (noting that "due process requires a meaningful opportunity to clear one's name . . . upon request"), we have not decided whether such a request is required.  See Hill, 455 F.3d at 239 n.19 ("[W]e have not held that [plaintiff] was required to [request a hearing.]"); see also Dean v. City of Coatesville, No. CIV.A. 09-4399, 2010 WL 1005142, at *4 (E.D. Pa. Mar. 17, 2010) (gathering cases).  Because Jacobs' stigma-plus claim otherwise fails, we need not decide this issue.

[16] The allegedly stigmatizing statements must also be substantially false.  Codd, 429 U.S. at 627.

disclosure element of the stigma-plus test, and thus fails to establish a Fourteenth Amendment violation.[17]

III

For the foregoing reasons, we will affirm.

---

[17] Because Jacobs has not shown he was prejudiced by McKevitt and Khan's failure to assert qualified immunity as a defense in their answer, the District Court properly permitted them to pursue the defense in their summary judgment motion, Oliver v. Roquet, 858 F.3d 180, 188 (3d Cir. 2017), and because Jacobs fails to "make out a violation of a constitutional right," McKevitt and Khan are entitled to qualified immunity, Karns v. Shanahan, 879 F.3d 504, 520 (3d Cir. 2018) (quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009)).

Moreover, because the District Court granted summary judgment on Jacobs' federal claims, it acted within its discretion in declining to exercise supplemental jurisdiction over Jacobs' state whistleblower claim. Doe v. Mercy Catholic Med. Ctr., 850 F.3d 545, 567 (3d Cir. 2017).